IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUSAN DOBRZENIECKI,<br>and THOMAS DOBRZENIECKI<br>      Plaintiffs,<br><br>  v.<br><br><br><br>REBECCA VELA SALISBURY,<br>JAMES VELA, ROBERT GROSSMAN,<br>TIMOTHY HOLEVIS, CHRISTOPHER<br>MUELLER, VILLAGE OF SAUK VILLAGE,<br>ST. JAMES HOSPITAL, DR. HEATHER<br>BROWN, DR. JOSEPH R. YATES, JOHN DOE<br>(SECURITY GUARD), AND JOHN DOE<br>SECURITY CO.<br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   No. 11 C 7956<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiffs Susan Dobrzeniecki ("Susan") and her husband Thomas Dobrzeniecki Sr.

("Thomas") brought this lawsuit against several Sauk Village police officers as well as St. James

Hospital and two of its emergency room doctors, alleging that Susan was unlawfully committed,

and the Dobrzeniecki family home unlawfully searched, in retaliation for conflicts between the

family and the Sauk Village Police.

Before the court are Defendants' motions to dismiss on various grounds. Defendant St.

James Hospital's[1] "Rule 12(G) Motion to Dismiss" is a combined motion to dismiss under Fed.

R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and under Fed. R. Civ. P. 12(b)(6) for

failure to state a claim. (Dkt. No. 36 ("St. James' Mot. to Dismiss").) The hospital's doctors,

---

[1] The hospital refers to itself in its motion papers as "Franciscan Alliance, Inc., f/k/a Sisters of St. Francis Health Services, Inc., d/b/a St. James Hospital and Health Centers.

Drs. Heidi Brown[2] and Joseph R. Yates, have joined in that motion with St. James (Dkt. No. 45), and these defendants will be referred to collectively as "the Hospital Defendants." Also before the court is the Sauk Village Defendants "Motion to Dismiss Counts I, II, III, VII, and VIII of the Plaintiffs' Second Amended Complaint Pursuant to Rule 12(b)(6)." (Dkt. No. 43 ("Sauk Village Defs.' Mot. to Dismiss.").)

For the reasons stated herein, the Sauk Village Defendants' Motion to Dismiss is granted in part and denied in part. Counts I, II, and III of the Second Amended Complaint may stand, but Counts VII and VIII are dismissed as to Defendants Rebecca Vela Salisbury and James Vela. The Hospital Defendants' Motion to Dismiss is granted in part and denied in part. Plaintiff Susan Dobrzeniecki's claim of institutional medical malpractice against St. James Hospital in Count VI is dismissed without prejudice. If she wishes to pursue such a claim, she must provide an amended Physician's Certificate by May 29, 2012 explaining how the hospital itself was negligent. If she fails to do so, any claim against the hospital for institutional negligence will be dismissed with prejudice. The remainder of the Hospital Defendants' Motion to Dismiss is denied for the reasons stated below.

<u>BACKGROUND</u>

Plaintiffs' eight-count complaint names several Sauk Village Police officers, including Rebecca Vela Salisbury[3], who they identify as the then-chief of police, Detective James Vela, Detective Sgt. Timothy Holevis, Detective Robert Grossman, and officer Christopher Mueller

---

[2] Dr. Brown's first name is incorrectly given as Heather in the caption of the complaint. (*See* Dkt. No. 42.)

[3] The record is unclear as to what position Salisbury held at the time of the incidents at issue in this case. In hospital records included in the Defendants' Motion to Dismiss, Salisbury identifies herself as deputy chief of police.

(collectively, the "Sauk Village Defendants").[4]  It also names St. James Hospital, located in

Chicago Heights, and two of its emergency room doctors, Drs. Brown and Yates.  In Counts I

through III, Plaintiffs allege that the Sauk Village Defendants violated their Fourth Amendment

rights.  In Count IV, Susan brings a claim of false imprisonment against the Hospital Defendants.

In Count V, Susan seeks to recover against Yates and the Hospital for intentional

misrepresentation.  In Count VI, she seeks to recover against the Hospital Defendants for

medical malpractice.  Count VII alleges intentional infliction of emotional distress against the

Hospital Defendants, Salisbury, and Vela.  Count VIII alleges negligent infliction of emotional

distress against the Hospital Defendants, Salisbury, and Vela.[5]  This court has jurisdiction over

the civil rights claims against the Sauk Village Defendants under 28 U.S.C. § 1331.  Plaintiffs

assert that this court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §

1367.

    The complaint sets forth the following facts, which will be accepted as true for the

purposes of this motion.  Susan and Thomas are residents of Sauk Village.  (Dkt. No 30 ("Sec.

Am. Compl.") ¶¶ 6,7).)  Susan is a Sauk Village employee who has worked for the village as a

building inspector or an administrative clerk since 2003, with the exception of a six-month

period in 2009.  (*Id.* at ¶ 14.)  Susan is a breast cancer survivor, while Thomas suffers from

---

[4] The court notes that the caption of the complaint includes the Village of Sauk Village,
but it does not appear that Plaintiffs have brought any claims against the village itself.

[5] In Count I, alleging illegal seizure, the complaint also names an unknown hospital
security guard, identified only as John Doe.  The security guard's employer, identified as "John
Doe Security Company" is named in Count IV, alleging false imprisonment by the Hospital
Defendants.  These defendants apparently have not been identified, and the claims against them
are not at issue in these motions.

multiple sclerosis. (*Id.* at ¶¶14, 15.) Their adult son Peter Dobrzeniecki ("Peter") resides with them in the family home. (*Id.* at ¶ 16.)

In the last several years, Susan had several run-ins with the Sauk Village Police Department. (*Id.* at ¶ 17.) In the summer of 2005, Susan had criticized the Department during an interview with a television news reporter about crime in her neighborhood. (*Id.*) After that, officers "targeted and harassed" Susan. (*Id.*) The Dobrzeniecki family had another run-in with the Department in 2008 over Peter living in the family home. (*Id.* at ¶ 18.) According to the complaint, Peter is a registered sex offender due to a statutory rape conviction as a result of consensual sex with his girlfriend when he was 18 years old and the girl was 16. (*Id.*) The Department tried to prevent Peter from living in the family home because of its proximity to a park. (*Id.*) Susan challenged the Department and successfully established that it had erred in calculating the distance from the family home to the park. (*Id.*) After this incident, Susan was harassed by members of the Department. (*Id.*) In particular, the complaint alleges that Salisbury, Vela, and Grossman harbored a grudge against her. (*Id.*)

Early on the morning of Nov. 9, 2009, Peter was shot in the face by an armed robber in Chicago Heights. (*Id.* at ¶ 19.) At about 10:30 a.m. in the parking lot outside Susan's place of work, Salisbury told Susan that her son had been shot. (*Id.* at ¶ 20.) Upset, Susan said something to the effect of: "I'm a good person. Why does this keep happening to me? If something happens to my son, I'll just die." (*Id.* at ¶ 21.) Sherry Jasinski, Susan's supervisor and friend, drove her to St. James Hospital to see her son. (*Id.* at ¶ 22.)

While Susan was visiting her son, Vela and a hospital security guard came into his hospital room and took Susan into the hallway, and then into another room. (*Id.* at ¶ 23.) There,

Vela searched Susan's purse, found her husband's multiple sclerosis medication and threatened her with a felony charge for possessing drugs. (*Id.*) Susan tried to return to her son's hospital room, but Vela and a hospital employee would not let her do so. (*Id.* at ¶ 24.) Salisbury and Vela then told her she needed to go downstairs to see hospital personnel. (*Id.*) Susan did not want to go, but agreed as long as Jasinski went with her. (*Id.*) Salisbury told Susan that if she accompanied them, she would be able to see her son and go home to take care of her husband. (*Id.*)

Susan then went to the emergency room, where she was led into a room. (*Id.* at ¶ 25.) Salisbury demanded that Susan turn over her coat, purse, and work phone, and falsely told Susan that she would give these items to Jasinski. (*Id.*) The door to the hospital room in which Susan had been placed was then locked. (*Id.*) Susan protested that there was nothing wrong with her, and repeatedly asked why she was being held in a hospital room and why her belongings had been taken. (*Id.* at ¶ 26.) Salisbury and a hospital nurse falsely told Susan she could not leave because they had a court order to keep her there. (*Id.*) Salisbury and Vela, with the aid of hospital personnel, then initiated involuntary commitment proceedings against Susan. (*Id.*)

At some point, Salisbury took Susan's purse and the keys to the family home. (*Id.* at ¶ 28.) There was no reasonable basis for this seizure. (*Id.*) At about 3:30 p.m. that day, Grossman, Holevis, and Mueller unlawfully entered the Dobrzeniecki family home using those keys. (*Id.* at ¶ 29.) Thomas, who is wheel-chair bound, was the only one home. (*Id.*) He did not consent the entry of police, and they did not have a warrant or any reasonable basis to search the home. (*Id.* at ¶¶ 29, 33, 34.) Grossman told Thomas he had a court order to enter the home, but did not produce a copy. (*Id.* at ¶ 30.) After entering the home, the officers searched it,

purportedly looking for the gun that had been used to shoot Peter. (*Id.* at ¶ 31.) There was no reasonable basis to believe the gun was in the home, but the Sauk Village Defendants used this a pretext to search the home. (*Id.*) During the search, Thomas repeatedly asked police how they got into his home and asked them to leave. (*Id.* at ¶ 32.) He also asked them where his wife and son were and what they were looking for, but police refused to answer his questions. (*Id.*)

For about 14 hours, Susan was held unlawfully against her will by the Hospital Defendants. (*Id.* at ¶ 35.) During that time, Hospital Defendants subjected her to a "battery of invasive and embarrassing tests" and kept her under video and audio surveillance. (*Id.*) During that time, the Hospital Defendants failed to observe the procedural protections against wrongful involuntary commitments, and their treatment of Susan fell below the standard of care. (*Id.*) Hospital records reflect that Susan was upset at being held in a locked room, insisted she had to go home to take care of her husband, and said she was not crazy. (*Id.* at ¶ 36.) During this time, she was forced to strip naked and undergo a medical exam, provide a urine sample for drug testing, and undergo a psychiatric evaluation. (*Id.*)

The complaint alleges that the Hospital Defendants failed to comply with the required procedures to subject someone to involuntary commitment under the Illinois Mental Health and Developmental Disabilities Code ("Mental Health Code"). In particular, according to the complaint, neither the police nor the Hospital Defendants prepared a petition for involuntary commitment as required by 405 ILCS 5/3–601. (*Id.* at ¶ 41.) Nor was the petition accompanied by the physician certificate required by 405 ILCS 5/3–602, which must state the clinical observations and factual information relied upon in reach a diagnosis. (*Id.* at ¶ 42.)[6]

---

[6] As will be discussed below, the Hospital Defendants have attached copies of what appears to be a petition and a physician's certificate to their motion to dismiss, although

Additionally, the statute, 405 ILCS 5/3-208, requires that the person conducting the examination explain to the patient the purpose of the exam, the patient's right to remain silent, and the possibility that any statements may be used against the patient in a commitment proceeding. (*Id.*) Susan alleges that no one told her of her rights, and instead hospital staff falsely told her there was a court order to hold her. (*Id.* at ¶ 43.) Susan also alleges that hospital staff failed to comply with other portions of the statute, for example by denying her telephone calls. (*Id.* at ¶ 45.)

At about 3:30 a.m. on Nov. 10, 2009, about 14 hours after first coming into contact with hospital staff, Susan was transferred to Riveredge Hospital, a psychiatric facility, via ambulance. (*Id.* at ¶¶ 46–48.) Susan did not consent to the transfer and refused to sign an authorization form, but Dr. Yates transferred her without her consent. (*Id.* at ¶ 47.) After being transferred to Riveredge, Susan was subjected to a battery of tests and then released into her own care with no medication. (*Id.* at ¶ 49.)

The complaint alleges that shortly after these events, both Salisbury and Holevis were demoted. (*Id.* at ¶¶ 50–51.) Susan was held against her will for almost two days, during which time she was subjected to invasive mental and physical examinations and kept under surveillance. (*Id.* at ¶ 53.) She was prevented from caring for her disabled husband or her son, and was not told the extent of Peter's injuries, which were potentially life-threatening. (*Id.* at ¶¶ 54–55.) Thomas also was prevented from learning the extent of his son's injuries, and was traumatized by the search of his home. (*Id.* at 56–57.) The court will address each motion to dismiss in turn.

---

Plaintiffs contest the authenticity of these documents and the truthfulness of certain statements within them.

<u>THE SAUK VILLAGE DEFENDANTS' MOTION TO DISMISS</u>

As a preliminary matter, the court grants the Sauk Village Defendants' motion to file a corrected reply brief in support of their motion to dismiss (Dkt. No. 58), as an incomplete version of that document apparently was filed inadvertently.

1.    <u>Count I: Illegal Seizure of Susan</u>

In Count I, Susan brings an § 1983 claim against Salisbury and Vela, arguing they illegally seized her when they initiated involuntary commitment proceedings against her in retaliation for her past run-ins with the Department.  (Sec. Am. Compl. ¶¶ 60–62.)  Salisbury and Vela argue that they are entitled to absolute or qualified immunity for their actions in connection with the involuntary commitment.  As a preliminary matter, they contend that contrary to the allegations in the complaint, the hospital records do in fact contain a Petition for Involuntary Commitment ("Petition"), signed by Salisbury.  Attached to their memorandum in support of their motion are Susan's hospital records, which include the Petition and a physician's certificate signed by Dr. Brown.[7]  This court may consider documents central to Plaintiffs' claims in evaluating a motion to dismiss even if they are not attached to the complaint.  *See Steigmann v. Democratic Party of Ill.*, 406 F. Supp. 2d 975, 986 (N.D. Ill. 2005).  In light of that principle, Salisbury and Vela ask this court to find that in executing the Petition, they were acting in a role akin to prosecutors and are therefore entitled to absolute immunity.  (Dkt. No. 44 ("Sauk Village Defs.' Mem. in Supp.") 2–3.)  Defendants correctly note that prosecutors are absolutely immune in a suit for damages under § 1983 for initiating proceedings on behalf of the state, including civil commitment proceedings.  *See Diestelhorst v. Ryan*, 20 F. App'x 544, 546 (7th Cir. 2001).

---

[7]    These records have not been filed on the electronic docket.

Their argument that their actions were similar to a prosecutor bringing civil commitment proceedings in a court of law is not particularly well-developed, however. Defendants point to no analogous cases in which police officers were found to be absolutely immune from allegations of wrongful seizure in connection with a petition for involuntary commitment.

The United States Supreme Court has held that the application of absolute immunity depends on a functional approach, so prosecutor who is "performing the traditional functions of an advocate" has absolute immunity for those actions. *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997). Because absolute immunity is a complete defense to liability for money damages, it is narrowly construed, and the official claiming absolute immunity has the burden of showing that public policy justifies immunity for the function in question. *Johnson v. Root*, 812 F. Supp. 2d 914, 919–20 (N.D. Ill. 2011). The Sauk Village Defendants have not carried their burden of showing that their actions were prosecutorial in nature.

Like an arrest, a civil commitment is a seizure implicating the Fourth Amendment, and may only be made upon probable cause. *Rusinowski v. Village of Hillside*, No. 11 C 4772, 2011 WL 6842509, at *3 (N.D. Ill. Dec. 29, 2011) (citing *Villanova v. Abrams,* 972 F.2d 792, 795 (7th Cir.1992)). This means that police may seize a person for commitment only if they have reasonable grounds to believe that the person is subject to seizure under the governing legal standard. *Id.* In Illinois, that standard is met when an officer has "reasonable grounds to believe that the person is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization to protect such person or others from physical harm." *See id.* (citing 405 ILCS 5/3-606). Just as police officers may be held liable under § 1983 for arresting a person without probable cause, they may be held liable for seizing a person for the purposes of involuntary

commitment.  Although the Sauk Village Defendants contend that the allegations in the complaint, read in the light most favorable to Susan, do not amount to a seizure for the purposes of involuntary commitment, the court disagrees.  (*See* Sec. Am. Compl. ¶¶ 24–26.)  Defendants have failed to carry their burden to show that absolute immunity should apply to such a claim.

In the alternative, Vela and Salisbury ask this court to find that they are entitled to qualified immunity because they complied with the Mental Health Code in initiating involuntary commitment proceedings.  (Sauk Village Defs.' Mem. in Supp. 5–6.)  Qualified immunity protects government officials performing discretionary functions from liability for civil damages provided their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In order to determine if qualified immunity applies, the court must consider (1) whether the alleged conduct violated plaintiff's constitutional rights; and (2) whether that right was clearly established.  *Surita v. Hyde*,  665 F.3d 860, 868 (7th Cir. 2011).

Vela and Salisbury rely on *Sherman v. Four County Counseling Ctr.*, 987 F.2d 397, 401–02 (7th Cir. 1993) to argue that the Second Amended Complaint should be dismissed because they have qualified immunity.  There, the Seventh Circuit held that where a police officer complied with the Indiana statute on involuntary commitments, and where his judgment that the plaintiff might be dangerous to others was reasonable, the police officer was entitled to qualified immunity in the plaintiff's unlawful arrest suit.  *Id.*

Susan contends that a determination of the applicability of qualified immunity is premature.  First, she argues that while St. James Hospital produced most of Susan's medical records at her request in December 2009, the hospital only recently turned over the Petition and

the physician's certificate accompanying it despite her repeated requests. (Dkt. No. 47 ("Pls.' Opp. to Sauk Village Defs.' Mot. to Dismiss") 4–5 n.1.) She challenges the authenticity of these documents, and additionally argues that the mere preparation of the Petition does not entitle Defendants to qualified immunity. (*Id.* at 5.) The court agrees.

The applicability of a qualified immunity defense is normally decided at the summary judgment stage, as it was in the *Sherman*. *See Rusinowski*, 2011 WL 6842509, at *5. While qualified immunity can be a basis for dismissal, the court must determine whether the facts alleged clearly establish that defense. *Id.* (citing *Stevens v. Umsted,* 131 F.3d 697, 706 (7th Cir.1997)). Here, Susan alleges that even if the Petition is authentic, Salisbury lied in the Petition when she stated that Susan was mentally ill that Susan had said "I just want to die. I do, I just want to die." (Pls.' Opp. to Sauk Village Defs.' Mot. to Dismiss 6.) Susan admits that after being informed that her son had been shot, she said "If something happens to my son, I'll just die." (Sec. Am. Compl. ¶ 22.) However, such a statement, made by Susan in the immediate aftermath of learning such distressing news, is very different from repeatedly saying that she *wanted* to die. Susan alleges she was not suicidal and never said she wanted to die. (*Id.* at ¶¶38–39.) Given the factual disputes over Susan's actions and condition at the time of her commitment, the court cannot determine at this stage of the case that it was objectively reasonable for Salisbury and Vela to seize Susan for the purposes of an involuntary commitment. For these reasons, Salisbury and Vela's motion to dismiss Count I of the complaint on the basis of absolute or qualified immunity is denied.

2.      Count II: Seizure of Susan's Purse and Keys

In Count II, Susan seeks to recover against Salisbury for the seizure of her purse and keys. Susan alleges that Salisbury lacked reasonable grounds to seize these items, and that she only gave them to Salisbury because the police officer told her she was going to give them to Jasinski. (Sec. Am. Compl. ¶ 67.) Instead, the keys were used to illegally enter the Dobrzeniecki family home. (*Id.* at ¶ 68.)

Salisbury relies on the legal maxim of *de minimis non curat lex*, which means, "The law does not concern itself with trifles." *See Old Town Pizza of Lombard, Inc. v. Corfu-Tasty Gyro's Inc.*, No. 11 C 6959, 2012 WL 638765, at *3 (N.D. Ill. Feb. 23, 2012). Salisbury contends that the purse and keys were taken for a period of 14 hours, so Susan suffered only a small but indefinite harm. (Sauk Village Defs.' Mem. in Supp. 7.) At this stage of the case, the court must consider the facts alleged in Plaintiffs' complaint to be true, and the court cannot consider it a "trifle" for police officers to seize a woman's keys without reasonable grounds and use those keys to effectuate an unlawful search of her home.

The case relied on by Salisbury, *Hessel v. O'Hearn*, 977 F.2d 299, 302–03 (7th Cir. 1992), rejected the application of the *de minimis* doctrine in the context of the theft of three cans of soda pop by police during the search of an illegal gambling business. The court observed that "if a loss is not only small but also indefinite, so that substantial resources would have to be devoted to determining if there was any loss at all, courts will invoke the *de minimis* doctrine and dismiss the case, even if it is a constitutional case." *Id.* at 303. The maxim is meant to prevent "expensive and mischievous litigation, which can result in no real benefit to [the] complainant." *Id.* The Seventh Circuit concluded, however, that there was no doubt that taking a person's property, even a can of soda, was wrongful. *Id.* at 304. "The *de minimis* doctrine is not intended

for definite losses, however small, inflicted by definite wrongs." *Id.* Seizing a woman's keys in order to effectuate an unlawful search of her home is a definite loss, although it may be difficult to quantify momentarily. Because Susan alleges a definite loss, inflicted by a definite wrong, Salisbury's motion to dismiss is denied. Count II may proceed.

3.  Count III: Illegal Search of Dobrzeniecki Family Home

In Count III, Susan and Thomas seek to recover against all the Sauk Village Defendants for the search of their home. The Sauk Village Defendants argue this count is improperly pleaded because it (and the other counts of the Second Amended Complaint) reincorporates each of the preceding paragraphs of the complaint. (Sauk Village Defs.' Mem. in Supp. 8.) It is true that courts frown upon "shotgun pleading" that incorporates all preceding paragraphs regardless of their relevance to a particular claim. *See CustomGuide v. Careerbuilder, LLC*, 813 F. Supp. 2d 990, 1001–02 (N.D. Ill. 2011). In *CustomGuide*, for example, this court dismissed a claim for misappropriation of intellectual property rights because, based on the factual allegations specifically included in that count, that claim was preempted by federal copyright law. *Id.* Although the misappropriation count purported to incorporate other facts by reference that might support such a claim and avoid preemption, this court declined to consider them because the plaintiff's pleading made it impossible to know which factual allegations were intended to support the misappropriation claim. *Id.* at 1001.

This case is different from *CustomGuide*, however, because there is no suggestion that Plaintiffs' claim that their home was unlawfully searched might depend on alternate or multiple sets of facts. Plaintiffs' theory of the case is clear: They contend that after Susan was unconstitutionally seized, Salisbury took her keys, and the Sauk Village Defendants used them to

illegally enter and search the Dobrzenieki family home.  Because the pleading is sufficiently clear to put Defendants on notice of the claim against them, the court denies the motion to dismiss Count III on the ground that it is inadequately pleaded.

4.     Count VII and VIII: Negligent and Intentional Infliction of Emotional Distress

In Count VII, Susan alleges intentional infliction of emotional distress by the Hospital Defendants, Salisbury, and Vela.  In Count VIII, she brings a claim of negligent infliction of emotional distress against those same defendants.  At issue is the applicable statute of limitations for these state law claims.  There is no dispute that the actions that form the basis of Plaintiffs' claims occurred on Nov. 9, 2009, and Nov. 10, 2009.  Plaintiffs filed suit on Nov. 8, 2011. Salisbury and Vela argue that these claims are barred by the one-year statute of limitations in the Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/8-101 ("Tort Immunity Act").  (Sauk Village Defs.' Mem. in Supp. 8.)  The Act provides that generally, no civil action may be commenced against a local public entity or its employees unless it is brought one year from the date the cause of action accrued.  745 ILCS 10/8-101(a).

Susan argues, however, that an exception in the statute for injuries "arising out of patient care" applies, so that she had two years to file suit over these claims, and her claims are timely. Specifically, the Tort Immunity Act provides:

> No action for damages for injury or death against any local public entity or public employee, whether based upon tort, or breach of contract, or otherwise, *arising out of patient care* shall be brought more than 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, or received notice in writing of the existence of the injury or death for which damages are sought in the action, whichever of those dates occurs first, but in no event shall such an action be brought more than 4 years after the date on which occurred the act or omission or occurrence alleged in the action to have been the cause of the injury or death.

745 ILCS 10/8-101(b) (emphasis added).  Susan argues that even though Salisbury and Vela did

not provide the patient care, Susan's injuries arose out of that care, so the longer statute of

limitations should apply.  Additionally, she contends that it is an "open question" as to whether

Salisbury and Vela guided Susan's care because the Hospital Defendants relied on their

judgment in the initial stages of her care.  (Pls.' Opp. to Sauk Village Defs.' Mot. to Dismiss 15.)

The Illinois Supreme Court has broadly construed "arising out of patient care" in the

context of the Tort Immunity Act.  *Kaufmann v. Schroeder*, 946 N.E.2d 345, 349 (Ill. 2011).  An

injury arises out of patient care if the injury is casually connected to the patient's medical care

and treatment.  *Id.*  However, this definition does not encompass "but for" causation. *Id.*  Rather,

the injury must originate in, stem from, or result from, patient's medical care.  *Id.* (citing *Orlak v.*

*Loyola Univ. Health Sys.*, 885 N.E.2d 999, 1007 (Ill. 2007)).  Susan cites no cases analogous to

this one in which a claim against police for an allegedly wrongful involuntary commitment has

been found to arise out of patient care.  Nor has this court found any cases on point.

When construing the Tort Immunity Act, this court must ascertain and give effect to the

intent of the legislature.  *Ramos v. City of Peru,* 775 N.E.2d 184, 188 (Ill. App. Ct. 2002)

(internal citation omitted).  The intent of the legislature in enacting a two-year statute of

limitations for actions arising out of patient care was to bring the Tort Immunity Act in line with

the typical two-year statute of limitations for medical malpractice claims, so that patients would

not be disadvantaged because they happened to obtain treatment at a public hospital rather than a

private one. *Kaufmann*, 946 N.E.2d at 349 (citing 93d Ill. Gen. Assembly, House Proceedings,

April 15, 2003, at 7–8 (statements of Representative Hultgren)).

Although the definition of patient care is broad, the court finds that it stretches the statute too far to find that Susan's claims against Salisbury and Vela arose out of patient care. Salisbury and Vela were not in the business of providing patient care. Further, as the Second Amended Complaint acknowledges, the duties that Salisbury and Vela owed Susan arose not from any duty to provide patient care, but from their duty as police officers to seize a person only with probable cause. (Sec. Am. Compl. ¶ 100.) Salisbury and Vela may be liable if they lacked reasonable grounds to believe that the seizure of Susan was necessary to protect her from physical harm. *See* 405 ILCS 5/3-606. But the wrong they committed against her did not arise out of their provision of patient care.

For these reasons, the court finds that Counts VII and VIII are untimely and must be dismissed as to Defendants Salisbury and Vela. In sum, then, the court denies the Sauk Village Defendants' motion to dismiss Counts I, II, and III of Plaintiffs' complaint, but grants their motion as to Counts VII and VIII. Next, the court will turn to the Hospital Defendants' motion to dismiss.

<u>HOSPITAL DEFENDANTS' MOTION TO DISMISS</u>

As an initial matter, Susan voluntarily dismisses Count V, which alleges intentional misrepresentation on the basis of Dr. Yates' alleged statement that Susan consented to her transfer to a mental health facility. Susan acknowledges this statement was not made to her. (Dkt. No. 46 ("Pls.' Resp. to Hospital Defs.' Mot. to Dismiss") 1.) Further, the Second Amended Complaint pleads no facts that show that Susan relied on those statements or that Dr. Yates intended that she do so, so the claim would be subject to dismissal for failure to state a claim regardless of her concession. (*See* Sec. Am. Compl. ¶¶ 84–87.) As such, Count V is

dismissed, and the court need not address the Hospital Defendant's argument that the tort of intentional misrepresentation does not apply in a personal injury setting. *See Doe v. Dilling*, 888 N.E.2d 24, 35–36 (Ill. 2008).

1.  Supplemental Jurisdiction over Hospital Defendants

Susan brings various state law claims against the Hospital Defendants: false imprisonment (Count IV), medical malpractice (Count VI); intentional infliction of emotional distress (Count VII), and negligent infliction of emotional distress (Count VIII). The Hospital Defendants first argue that all of these state law claims must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) because this court does not have supplemental jurisdiction over them under 28 U.S.C. § 1367. (Dkt. No. 37 ("Hosp. Defs.' Mem. in Supp.") 4–6).

As noted above, this court has jurisdiction over the civil rights claims against the Sauk Village Defendants under 28 U.S.C. § 1331. A federal district court has supplemental jurisdiction "over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Henderson v. Bramlet*, No. 3:08-cv-315-DGW, 2012 WL 506975, at *4 (S.D. Ill. Feb 15, 2012) (quoting 28 U.S.C. § 1367(a)). A district court has discretion to exercise supplemental jurisdiction when the state law claims and the federal law claims derive from a common nucleus of operative fact. *Id.* (citing *Houskins v. Sheahan,* 549 F.3d 480, 495 (7th Cir. 2008)). This is not a high bar, as even loose factual connections are sufficient. *Houskins,* 549 F.3d at 495. The court finds that this standard is met in the instant case. Susan alleges wrongdoing by both the Sauk Village Defendants and the Hospital Defendants in connection with the decision to involuntarily commit her. As noted above, from the medical records

submitted by the Hospital Defendants, it appears that Salisbury filled out the Petition for involuntary commitment, while Dr. Brown provided the physician's certificate and Dr. Yates was involved in the decision to transfer Susan to a psychiatric hospital. Whether Susan's commitment was proper will be an issue in the claims against both sets of defendants, so this court has discretion to exercise supplemental jurisdiction over the state law claims against the Hospital Defendants.

Alternatively, however, the Hospital Defendants argue that this court should decline to exercise supplemental jurisdiction because Susan's claims raise "novel and complex issues of state law" under 28 U.S.C. § 1367(c)(1). They contend that the interpretation of the provisions of the Mental Health Code would be better addressed by an Illinois state court, and note that it is an open question of Illinois as to whether the current version of the Mental Health Code allows an implied cause of action. However, this court has previously held that the Illinois Supreme Court is likely to recognize an implied right cause of action for claims under the Mental Health Code because the Illinois Appellate Court had found a private right of action under the statute's predecessor. *Marx v. Northwestern Mem'l Hosp.*, No. 04 C 5688, 2007 WL 1280643, at *4 (N.D. Ill. April 30, 2007) (citing *Montague v. George J. London Mem'l Hosp.*, 396 N.E.2d 1289, 1293 (Ill. App. Ct. 1979)). As stated in *Marx*, this court has no reason to think the Illinois Supreme Court would deviate from the reasoning in *Montague*. *Id.* Further, the court notes that although Susan's claims implicate the provisions of the Mental Health Code, she has not directly brought a cause of action under the Mental Health Code. Rather, she alleges several common law claims stemming from her allegedly wrongful involuntary commitment. This court may have to interpret certain provisions of the Mental Health Code in adjudicating the claims against

the Hospital Defendants.  However, the court will not decline to exercise supplemental jurisdiction on this basis.  As such, the Hospital Defendants' motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) is denied.

2.     Count VI: Sufficiency of Physician's Certificate

Next, the Hospital Defendants argue that Susan's medical malpractice claims against them must be dismissed for failure to state a claim because the Physician's Certificate accompanying her claims is insufficient under 735 ILCS 5/2-622.  Under Illinois law, a plaintiff must file a physician's certificate of merit and an accompanying report with every malpractice claim, and this provision also is applicable to medical malpractice suits filed in federal court. *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000).

The version of the statute currently in effect[8] requires that a plaintiff seeking damages because of medical malpractice must attach to the complaint: (1) an affidavit from the plaintiff or her attorney that a qualified health professional has determined in a written report that there is a meritorious cause of action; and (2) the health professional's written report indicating the basis for his determination.  735 ILCS 5/2–622 (West 1994).  The healthcare professional must certify that he or she is: (1) knowledgeable about the relevant issues involved in the particular action; (2) practices or has practiced within the last five years or teaches or has taught within the last six years in the same area of medicine that is at issue in the action; and (3) is qualified by experience or demonstrated competence in the subject of the case.  *Id.*

---

[8] Due to recent Illinois Supreme Court rulings invalidating and interpreting acts amending § 2-622, the law currently reads as it did when amended in 1989 by Public Act 86–646, with the exception of certain language regarding naprapaths that is not relevant here. *Cookson v. Price,* 941 N.E.2d 162, 164 (Ill. 2010). Accordingly, the court looks to that version of § 2-622 for purposes of determining the instant motions.

The Hospital Defendants take issue with the report submitted in this case by Dr. Stephen H. Dinwiddie.[9] (Dkt. No. 22–1, 22–2, 22–3 ("Physician's Certificate").) In it, Dr. Dinwiddie says he is currently a professor of psychiatry at Northwestern University Feinberg School of Medicine, where he has had an academic appointment since January 2011. (*Id.* at 1.) Since that time, he also has had a hospital appointment with Northwestern Memorial Hospital. (*Id.*) Dr. Dinwiddie asserts that he has been a licensed physician teaching and practicing psychiatry in Missouri and Illinois since 1986. (*Id.*) Dr. Dinwiddie states that he has reviewed the available medical records from St. James Hospital and Riveredge Hospital. He states that he is qualified to testify regarding the conduct of Drs. Yates and Brown in regard to Susan's commitment. (*Id.*) In Dr. Dinwiddie's opinion, the Hospital Defendants did not follow the proper procedures to commit Susan because her alleged statement that she "wanted to die" was made in the context of being informed about her son's shooting. (*Id.* at 1–2.) That statement, combined with her subsequent statements that she was not suicidal, was insufficient to substantiate a finding that she was a threat to herself, particularly in light of her lack of other symptoms and her report that she had no significant prior psychiatric problems. (*Id.* at 2.)

The Hospital Defendants argue that it is unclear from the report how Dr. Dinwiddie is qualified to make a judgment about the involuntary commitment of patients, as it is unclear whether he practiced in a hospital setting prior to 2011. (Hosp. Defs.' Mem. in Supp. 10–11.) Nor does the report demonstrate how Dr. Dinwiddie is qualified to make a judgment about how the hospital itself was negligent, the Hospital Defendants assert. (*Id.* at 11.) Susan offers to

---

[9] Dinwiddie has submitted three substantively identical reports as to each of the three defendants: the hospital itself, Dr. Yates, and Dr. Brown.

amend Dinwiddie's report to include his full curriculum vitae, which shows that Dr. Dinwiddie has had appointments with various hospitals since 1986. (*See* Dkt. No. 46-1.)

The court will allow that amendment, and finds Dr. Dinwiddie's report to be satisfactory to meet the standards laid out in Section 2–622 as to Drs. Brown and Yates. The statute is a tool to reduce frivolous lawsuits by requiring a minimum amount of merit, but is to be liberally construed in favor of a malpractice plaintiff. *Cutler v. Northwest Suburban Community Hosp., Inc.*, 939 N.E.2d 1032, 1042 (Ill. App. Ct. 2010). Dr. Dinwiddie's report establishes that he is knowledgeable about the relevant issues in the action, has practiced psychiatry in the last five years, and is qualified by experience in the subject of the case. Dr. Dinwiddie explains why and he believes Drs. Brown and Yates were negligent in terms of her involuntary commitment and subsequent transfer to Riveredge Hospital.

Although it is not entirely clear, it appears that in her medical malpractice claim Susan is asserting both vicarious negligence on the part of St. James Hospital for acts of its alleged agents, Drs. Brown and Yates, and institutional negligence against the hospital itself. (Sec. Am. Compl. ¶¶ 89–90.) Dr. Dinwiddie's Physician's Certificate addresses only the conduct of the individual defendants. Generally, when a hospital is the defendant in a medical malpractice action, a physician licensed in all branches of medicine is qualified to submit the Physician's Certificate. *Jacobs v. Rush North Shore Med. Ctr.*, 673 N.E.2d 364, 367 (Ill. App. Ct. 1996). However, if the allegation is a failure to supervise, a reviewing professional may be required to demonstrate competence in health care administration. *Id.* At any rate, the reviewing physician must discuss the involvement of each defendant in the treatment of the plaintiff and reach more than a "generalized conclusion" of malpractice. *Id.* (internal quotations omitted.) In particular,

the reviewing physician must discuss how the hospital itself deviated from the standard of care applicable to it. *Id.* It is unclear what negligence Susan is alleging the hospital committed in its own right.

Because the Physician's Certificate is not adequate as to St. James Hospital, the court must dismiss the medical malpractice claim against it in Count VII to the extent it is based upon institutional negligence by the hospital. The court, however, will allow Susan to file an amended Physician's Certificate that meets the requirements of the statute as to St. James Hospital. The statute does not require dismissal with prejudice, and amendments to malpractice claims typically are liberally allowed so that the case may be decided on its merits, not on the basis of procedural requirements. *Cato v. Attar*, 569 N.E.2d 1111, 1113 (Ill. App. Ct. 1991). As such, Susan is given until May 29, 2012 to file an amended Physician's Certificate explaining how St. James Hospital committed institutional negligence. If she fails to do so, any claim she has against the hospital for institutional negligence as to Count VI will be dismissed with prejudice.[10]

### 3. Count VIII: Negligent Infliction of Emotional Distress

Next, the Hospital Defendants argue that Susan's claim of negligent infliction of emotional distress must be dismissed for failure to plead that her distress arose from a contemporaneous physical impact. (Hosp. Defs.' Mem. in Supp. 13.) The parties dispute both

---

[10] Defendants argue that all the claims against them are subject to dismissal for failure to attach a sufficient Physician's Certificate because all the claims involve the exercise of medical judgment. (Hosp. Defs.' Mem. in Supp. 9.) It is unclear to the court whether Susan is alleging direct liability against the Hospital in Counts IV, VII, and VII, or merely that the Hospital is vicariously liable for the torts of alleged agents, Drs. Brown and Yates. Nor is the nature of the employment or agency relationship between the Hospital and the Defendant doctors clear. If Susan fails to submit a revised Physician's Certificate as to the Hospital, the court will consider at that time whether any portion of the other claims against the Hospital should be dismissed.

whether Susan has adequately pleaded such an impact and whether Illinois law still requires that she do so.

As to the first question, Susan contends that she did in fact suffer a contemporaneous physical impact, because the Hospital Defendants held her against her will, performed a battery of invasive tests on her, and involuntarily committed her to Riveredge Hospital. (Pls.' Opp. To Hosp. Defs.' Mot. to Dismiss 8.) The court agrees that this satisfies the requirement of a physical impact. As alleged, the hospital's treatment of Susan was a contemporaneous physical contact in this case that caused Susan's emotional distress. *Cf. Barnes v. Anyanwu*, 391 F. App'x 549, 551–52 (7th Cir. 2010) (affirming dismissal of negligent infliction of emotional distress claim where prison medical director declined to provide inmate with treatment because there was no treatment, and therefore no physical impact).

Nonetheless, the court feels compelled to comment upon the tone of Plaintiff counsel's argument that the direct impact rule has been eliminated by the Illinois courts for direct victims[11] in negligent infliction of emotional distress cases. Counsel points to dicta from the Illinois Supreme Court's ruling in *Pasquale v. Speed Products Eng'g*, 654 N.E.2d 1365, 1371 (Ill. 1995). Relying on a previous ruling, *Corgan v. Muehling*, 574 N.E.2d 602, 606–07 (Ill. 1991), the court wrote in dicta that it had "eliminated the contemporaneous injury or impact requirement for a direct victim's recovery for emotional distress based on a theory of negligence." *Id.* In fact, in *Corgan*, the Illinois Supreme Court addressed whether a direct victim of negligent infliction of emotional distress had to allege that she suffered a physical manifestation of her emotional distress, as a bystander is required to do. 574 N.E.2d at 607. The *Corgan* court held that she did

_____

[11] Direct victims are those that are actually injured by the alleged negligence, as Susan was in this case. Different rules apply to so-called bystanders. *Barnes*, 391 Fed. App'x at 552.

not.  *Id.* at 608–09.  The *Corgan* court did not address the impact rule, and in fact there was no question in that case that the plaintiff had suffered a physical impact, as her suit rested on her allegation that her psychologist had sex with her under the guise of providing her with therapy. *Id.* at 603.

Given the direct language in *Pasquale*, this court can understand Plaintiff's counsel feeling compelled to argue that the impact rule has been eliminated in Illinois.  However, in so doing, counsel uses unnecessarily strident rhetoric.  In addressing district court rulings holding that the physical impact rule does still apply, counsel takes aim at Judge Gettleman's ruling to that effect in *Fenner v. Favorite Brands Int'l, Inc.*, No. 97 C 5906, 1998 WL 249232 (N.D. Ill. May 12, 1998).  There, Judge Gettleman held: "The *Pasquale* court's characterization of the holding in *Corgan* is inaccurate.  The court in *Corgan* did not eliminate the need for a direct victim to allege and prove a contemporaneous injury or impact."  *Id.* at *7.

Counsel for Plaintiffs takes exception to that holding, writing:  "Now that is some chutzpah[12], holding that the Illinois Supreme Court in *Pasquale* just got it wrong when it interpreted its own prior opinion in *Corgan*."  (Pls.' Resp. to Hosp. Defs.' Mot. to Dismiss 11.) In fact, it is nothing of the sort, as the Seventh Circuit has repeatedly held that the impact rule survives in Illinois post-*Corgan*.  *See Barnes*, 391 F. App'x at 553.  Although the court acknowledges some confusion in both the Illinois Appellate Courts and courts of this district because of the language in *Pasquale*, this court is required to follow the Seventh Circuit's repeated rulings that the impact rule still applies.  *See id*.  While counsel is free to argue these rulings are in error, this court urges counsel to take a more decorous tone in the future.

_____

[11] Chutzpah, a Yiddish word, means "brazenness" or "gall."  American Heritage Dictionary Second College Edition 273 (2d. Ed. 1982).

Regardless, because Susan has adequately alleged a contemporaneous physical impact, her claim for negligent infliction of emotional distress in Count VIII may stand as to the Hospital Defendants.

4.      Attorney's Fees and Prejudgment Interest

Finally, the Hospital Defendants seek to strike Plaintiffs' request for attorney's fees and prejudgment interest.  In their response, Plaintiffs clarify that she is seeking those damages only as to their federal civil rights claims, and not as to the Hospital Defendants.  Plaintiffs' requests for relief may go forward on that basis.

CONCLUSION

For these reasons, the Sauk Village Defendants' "Motion to Dismiss Counts I, II, III, VII, and VIII of the Plaintiffs' Second Amended Complaint Pursuant to Rule 12(b)(6)" (Dkt. No. 43) is denied as to Counts I, II, and III.  Counts VII and VIII are dismissed as those counts relate to Defendants Rebecca Vela Salisbury and James Vela.  The Sauk Village Defendants' "Motion for Leave to File Corrected Reply" (Dkt. No. 58) is granted in its entirety.  The Hospital Defendants'  "Rule 12(G) Motion to Dismiss" (Dkt. No. 36) is granted as to Plaintiff Susan Dobrzeniecki's claim of institutional medical malpractice against St. James Hospital in Count VI, which is dismissed without prejudice.  If she wishes to pursue such a claim, she must file an amended Physician's Certificate by May 29, 2012 that appropriately explains how St. James Hospital  itself was negligent.  If Plaintiff Susan Dobrzeniecki fails to do so, any claim against the hospital for institutional negligence against St. James Hospital in Count VI will be dismissed with prejudice.  The remainder of the Hospital Defendants' Motion to Dismiss is denied for the reasons stated.

ENTER:

_James F. Holderman_

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: April 27, 2012