IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SUSAN DOBRZENIECKI          )
          )
     Plaintiff,         )
          )
    v.          )
          )    No. 11 C 7956
REBECCA VELA-SAILSBERY,     )
ROBERT GROSSMAN, TIMOTHY HOLEVIS   )
CHRISTOPHER MUELLER,      )
ST. JAMES HOSPITAL, and HEIDI BROWN,  )
          )
     Defendants.        )
          )

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On November 9, 2009, Peter Dobrzeniecki ("Peter"), the adult son of plaintiff Susan Dobrzeniecki ("Susan"), was shot in the face, setting in motion a series of events that included the involuntary commitment of Susan and a warrantless search of the Dobrzenieckis' Sauk Village, Illinois home by the police. On November 8, 2011, Susan and her now-deceased husband, Thomas Dobrzeniecki, Sr. ("Thomas"), filed this lawsuit against several Sauk Village police officers, as well as St. James Hospital and two of its emergency room doctors.[1]

During the course of this litigation, Susan has amended her complaint four times. (Dkt. Nos. 5, 30, 99, 178.) Susan's fourth amended complaint ("Fourth Amended Complaint") (Dkt. No. 178 ("Am. Compl.")) contains six counts: two claims brought under 42 U.S.C. § 1983

---

[1] Thomas passed away on October 1, 2013, (Dkt. No. 137 ¶ 4), leaving Susan as the sole plaintiff proceeding on behalf of herself and as the court-appointed administrator of her deceased husband's estate. (Dkt. No. 248 ¶ 1.)

against Sauk Village Acting Chief of Police Rebecca Vela-Sailsbery ("Vela-Sailsbery")[2] for illegal seizure of Susan's person (Count I) and her purse and keys (Count II); a § 1983 claim against Vela-Sailsbery and three other Sauk Village police officers—Timothy Holevis ("Holevis"), Robert Grossman ("Grossman"), and Christopher Mueller ("Mueller") (collectively, the "Sauk Village Defendants")—for illegal entry into and search of the Dobrzenieckis' home (Count III); and claims for medical malpractice (Count VI), intentional infliction of emotional distress (Count VII), and negligent infliction of emotional distress (Count VIII) against Dr. Heidi Brown ("Dr. Brown") and St. James Hospital ("St. James") (collectively, the "Hospital Defendants").[3] The Sauk Village Defendants and the Hospital Defendants have moved separately for summary judgment on all of Susan's claims. (Dkt. Nos. 168, 171, 207.) For the following reasons, the Sauk Village Defendants' motion is denied, and the Hospital Defendants' motions are granted in part and denied in part.

## RELEVANT FACTUAL BACKGROUND

In November 2009, Susan, Thomas, and their son Peter lived together in Sauk Village, Illinois. (Dkt. No. 209 ¶ 3.) Susan remains a Sauk Village resident as well as a Sauk Village employee, where she has worked as a building inspector or an administrative clerk since 2003, with the exception of a six-month period in 2009. (Dkt. No. 178 ¶ 11.) Until his death in 2013, Thomas suffered from multiple sclerosis. (Dkt. No. 244 ¶ 24.) Susan contends that in November 2009, Thomas was not physically capable of walking without assistance of a family member or a

---

[2]   Both Susan and Vela-Sailsbery herself have previously spelled Vela-Sailsbery's name as "Salisbery." (*See, e.g.*, Dkt. Nos. 43, 46.) The parties have since corrected the spelling to "Sailsbery."

[3]   After this court dismissed Counts IV and V, (Dkt. No. 60), Susan did not renumber the counts contained in her Fourth Amended Complaint.

rollater, nor was he capable of walking downstairs. (*Id.*) The Sauk Village Defendants dispute Thomas's physical limitations, (Dkt. No. 244 ¶ 24), notwithstanding the fact that Vela-Sailsbery has previously stated on a sworn document that Thomas was "bed ridden" in November 2009 (Dkt. No. 213 at 3).

I.    Peter's Shooting

Early on the morning of November 9, 2009, Susan's son Peter was shot in the face in Chicago Heights, Illinois. (Dkt. No. 248 ¶ 2.) At about 10:30 a.m., in the parking lot outside Susan's place of work, Vela-Sailsbery told Susan that her son had been shot, (*id.* ¶ 3), after which Susan became upset and started crying because she thought that her son might be dead or dying (*id.* ¶ 4). Susan said something to the effect of "I'm a good person. Why does this keep happening to me? If he dies, I want to die." (*Id.* ¶ 5.) Sherry Jasinski ("Jasinski"), Susan's supervisor and best friend, drove Susan to St. James to see her son. (*Id.* ¶¶ 6-7.)

After telling Susan that Peter had been shot, Vela-Sailsbery spoke with Sauk Village Chief of Staff Burnetta Hill-Corley ("Hill-Corley") in the Sauk Village administrative building. (*Id.* ¶ 8.) According to her testimony, Vela-Sailsbery then left the administrative building to go to lunch with her assistant, Lisa Gibbons ("Gibbons"). (Dkt. No. 212 at 12:5-14-6.) Sometime before Vela-Sailsbery and Gibbons ate lunch, however, Vela-Sailsbery received a call on her cell phone from Hill-Corley directing her to come to St. James. (*Id.* at 14:23-24.) Susan disputes Vela-Sailsbery's reason for coming to St. James, contending that Vela-Sailsbery did so because she suspected Susan might be involved in the shooting of her son. (Dkt. No. 248 ¶ 9.)

Upon arriving at St. James, Vela-Sailsbery told a nurse that Susan had said that she "just wanted to die." (Dkt. No. 209 ¶ 19.) The parties dispute whether Vela-Sailsbery also informed the nurse of the context—specifically, that Susan made her comments immediately after

Vela-Sailsbery informed her that Peter had been shot. (Dkt. No. 249 ¶ 19.) After speaking with the nurse, Vela-Sailsbery filled out a petition ("Petition") (Dkt. No. 213 ("Pet.")) to commit Susan involuntarily. (Dkt. No. 209 ¶ 20.) Vela-Sailsbery states that she decided to initiate the commitment process because of the "dire gravity of the scene [at St. James]," and Vela-Sailsbery's desire "to seek attention for [her] colleague."[4] (Dkt. No. 208 at 8.) Susan disputes that Vela-Sailsbery's actions arose out of her personal concern for Susan's well-being. Instead, Susan asserts that Vela-Sailsbery's actions were in retaliation for Susan's and the Dobrzenieckis' long-simmering disputes with the Sauk Village police department and Vela-Sailsbery's personal suspicion that Susan was involved in the shooting of her own son.[5]

## II.    The Petition

Susan asserts that in completing the Petition, Vela-Sailsbery made a number of false statements that led to Susan being committed against her will. First, Vela-Sailsbery checked boxes on the Petition stating (1) Susan was mentally retarded, (2) Vela-Sailsbery had a legal interest in the matter, and (3) Vela-Sailsbery had a financial interest in the matter. (Dkt. No. 248 ¶ 13.) The nurse later scratched out Vela-Sailsbery's answers and wrote "Error" on the erroneously completed sections of the Petition. (*Id.*) Second, the Petition contains a section to list the names and addresses of Susan's spouse, parent, guardian, substitute decision-maker, close relative, or friend. (Pet. at 4.) In the absence of listing any names, the petitioner must certify that he or she conducted a diligent inquiry to identify and locate a spouse, parent, guardian, substitute

---

[4]    In the Petition, Vela-Sailsbery describes her relationship to Susan as "Police Officer. No relationship." (Pet. at 4.)

[5]    Susan's Fourth Amended Complaint chronicles at length the purported animosity between the Dobrzenieckis and the Sauk Village police department. (Am. Compl. ¶¶ 14-15.) Her Rule 56 Statement does not rehash the specific conflicts.

decision-maker, close relative, or friend. (*Id.*) Vela-Sailsbery failed to conduct any inquiry and instead listed herself, despite the fact that (1) on the same page, she described herself as having "no relationship" with Susan, (*id.*), and (2) Susan's "best friend" Jasinski was also at St. James at the time. Third, Vela-Sailsbery certified that she made a good faith attempt to determine whether Susan had executed a power of attorney for health care. (*Id.* at 4.) Susan contends that Vela-Sailsbery made no such inquiry. (Dkt. No. 248 at 16.) Fourth, Vela-Sailsbery stated on the Petition that Susan said "I just want to die, I do, I just want to die." (Pet. at 3.) Susan asserts that Vela-Sailsbery intentionally omitted the context—Susan had just learned that her son had been shot—and misrepresented Susan's statement, which was actually "If he dies, I want to die." (Dkt. No. 248 ¶ 17.)

III.    <u>Susan's Seclusion</u>

After Vela-Sailsbery completed the Petition, Susan agreed to speak with a St. James nurse, who took Susan to a St. James "seclusion" room. (Dkt. No. 209 ¶ 23.) Another St. James nurse "triaged" Susan and noted, according to the Petition, that Susan had "made comments [that] she wants to die," and was "non-compliant with psych meds." (*Id.* ¶ 24.)

The parties agree that Vela-Sailsbery entered the seclusion room with a St. James nurse, who asked Susan to take off her clothes and put on a robe. (Dkt. No. 248 ¶ 18; Dkt. No. 209 ¶ 26.) The parties appear to dispute that Susan complied, but stated that she first wanted to give her purse to Jasinski, her best friend, who was waiting in the hall outside the seclusion room. (Dkt. No. 248 ¶ 18.) Susan asserts that Vela-Sailsbery agreed to give Susan's purse to Jasinski and that Susan then gave her purse to Vela-Sailsbery based on that assurance. (*Id.*) Vela-Sailsbery contends that "Sailsbery was given the purse by [Susan]. [Susan]'s purse was taken by hospital staff." (Dkt. No. 244 ¶ 18.)

- 5 -

Vela-Sailsbery upon leaving the seclusion room did not, however, give Susan's purse to Jasinski. (Dkt. No. 248 ¶ 19.) Vela-Sailsbery contends that she determined that because Susan was being admitted to St. James, her purse was "property turned over to me," which Vela-Sailsbery decided to keep based on "officer discretion." (Dkt. No. 212 at 8:13-23.) Instead of giving Susan's purse to Jasinski, Vela-Sailsbery took Susan's purse back to Sauk Village Hall and placed it in a filing cabinet. (Dkt. No. 209 ¶ 28.)

IV.    Warrantless Search of Dobrzeniecki Family Home by Sauk Village Police

At approximately 3:00 p.m. on November 9, 2009, Detective Grossman and two of his fellow Sauk Village police officers—Mueller and Holevis—went to the Dobrzenieckis' home in Sauk Village, purportedly to conduct a "wellness check" on Thomas (Dkt. No. 209 ¶¶ 43-45; Dkt. No. 248 ¶ 22.) The officers claim that Thomas walked down the stairs to greet them at the door and invited them in, (*id.* ¶ 46-47), while Susan asserts that the officers' version of events is impossible because Thomas was not physically capable of walking down stairs. (Dkt. No. 248 ¶ 24.) Instead, Susan claims that the officers entered her home using keys from her seized purse. (Dkt. No. 248 ¶ 22.) Susan's and Thomas's other son, Tom Dobrzeniecki, Jr. ("Tom Jr."), arrived as the officers were leaving and observed Grossman standing over Susan's car with her keys in his hand. (*Id.* ¶ 26.)

Although the officers' stated basis for entering the Dobrzenieckis' home was to perform a "wellness check" on Thomas, they acknowledge searching for a firearm once they were inside the home. (Dkt. No. 209 ¶ 50.) The extent of the officers' search is disputed. The officers claim they looked only for a firearm lying out in the open, (*id.*), while Tom Jr. testified that every drawer in Susan's bedroom was tossed and open and that "stuff [was] [lying] all over the place." (Dkt. No. 248 ¶ 25.)

V.     Susan's Medical Treatment at St. James

From about 2:15 to approximately 2:42 p.m. on November 9, 2009, Dr. Brown examined Susan in the seclusion room, (Dkt. No. 201 ¶ 4), and ultimately ordered that Susan be held in seclusion for her safety because she presented an "elopement" risk and a risk of harm to herself. (Dkt. No. 209 ¶ 25.)

Susan and Dr. Brown dispute the rigor of Dr. Brown's examination. Dr. Brown asserts that she conducted a physical examination of Susan, ordered lab tests, and spoke with Susan about the stressors in her life. (Dkt. No. 186 ¶¶ 18, 19.) Based on Susan's statement to Vela-Sailsbery and the "other stressful events" in Susan's life, Dr. Brown became convinced that Susan may be suicidal. (*Id.* ¶ 23.)

Susan does not dispute that Dr. Brown ultimately came to such a conclusion, but contends that Dr. Brown did so based on an inadequate examination. Susan asserts that Dr. Brown failed to ask any questions about suicidality, (Dkt. No. 201 ¶ 7), erroneously noted that Susan had a family history of suicide, (*id.* ¶ 8), and specifically ignored the four categories that Dr. Brown was directed to evaluate on the St. James's "Psych/Medical Clearance Template"—Orientation, Judgment and Insight, Memory, and Mood and Affect (*id.* ¶ 9a-f). In place of the examination protocol set forth by St. James, Susan states that Dr. Brown blindly relied on the false statements in the Petition. For example, Susan contends that Dr. Brown accepted Vela-Sailsbery's allegedly false statements on the Petition without ever speaking to Vela-Sailsbery or Jasinski, both of whom were at St. James. Similarly, Susan asserts that Dr. Brown failed to confirm Susan's current "medication profile," which would have revealed that Susan was not, in fact, "non-compliant with [her] psych meds," as indicated on the Petition. (*Id.*

¶ 11.) The physician certificate ("Certificate") supporting Susan's commitment supports Susan's version of Dr. Brown's examination. (Dkt. No. 172 Ex. H at 33.)

Under 405 ILCS 5/3-602, a physician must complete a certificate stating the clinical observations and factual information relied upon in reaching a diagnosis. In the Certificate supporting Susan's involuntary commitment, Dr. Brown listed the following three observations: (1) "[p]atient stated to co-worker that she wanted to die"; (2) "[p]atient not taking medication (Lexapro) prescribed previously"; and (3) "[s]tated to co-work[er] 'I just want to die, I do, I just want to die." (*Id.*) Dr. Brown's observations reflect only the purportedly false statements contained in the Petition. By contrast, Dr. Brown did not list any of the observations from her examination, which she testified were the bases for her diagnosis that Susan might be suicidal.

Dr. Edward Ward, Susan's medical expert, testified that Dr. Brown's examination and failure to verify the statements set forth in Vela-Sailsbery's Petition fell short of the standard of care for an emergency room doctor performing an examination that might result in the patient's involuntary commitment. (Dkt. No. 201 ¶ 21.)

VI.  Susan's Transfer to Riveredge Hospital

Around 2:45 p.m. on November 9, 2009, after Dr. Brown completed the Certificate in support of Susan's involuntary commitment, Dr. Brown advised Susan that she would need to be examined by a psychiatrist. (Dkt. No. 186 ¶ 30.) Dr. Brown also advised Susan that St. James did not have any psychiatrists on call and that St. James might have to transfer her to another hospital. (*Id.*) At 6:30 p.m., St. James contacted Riveredge Hospital ("Riveredge") to inquire about accepting Susan as a patient. (*Id.* ¶ 38.) Sometime between 12:25 a.m. and 3:30 a.m. on November 9, 2009—the parties dispute the precise time—St. James transferred Susan to Riveredge. (*Id.* ¶ 39.)

During the 10-14 hours St. James held Susan in the seclusion room, Susan contends that St. James rarely checked on her, failed to provide her a meal at an appropriate interval, and refused to permit her to contact her family—all in violation of St. James's own policies and the required standard of care for patients held against their will. (Dkt. No. 199 ¶¶ 15, 25.) Susan also asserts that none of St. James's personnel provided Susan with a description of her rights; instead she states that a nurse falsely told her that she was being held pursuant to a court order, which she was not permitted to see. (*Id.* ¶ 12.)

Finally, Susan contends that St. James transferred her to Riveredge without verifying that Susan was medically stable for a transfer and without advising Susan of the "risks and benefits" of the transfer. (*Id.* ¶¶ 22.) Dr. Brown, however, signed an "Authorization for Transfer Form" stating that St. James staff had, in fact, performed each task. (*Id.*) Furthermore, when Susan refused to sign the form consenting to her transfer, she contends that a St. James nurse falsely recorded that Susan was "unable to sign due to [her] physical condition. (*Id.* ¶ 23.) Susan contends that the nurse did this pursuant to a St. James policy which instructs nurses to always document "Patient unable to sign due to physical condition," whenever a patient refuses to consent to a transfer. (*Id.*)

After being transferred to Riveredge, Susan was subjected to a battery of tests and released into her own care the next day, November 11, 2009, at 1:50 p.m. (Dkt. No. 186 ¶ 59; Compl. ¶ 43.)

LEGAL STANDARD

A grant of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the court of the basis for

its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). "There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." *Brewer* v. *Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). When ruling on a motion for summary judgment, the court must consider the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *Woodruff* v. *Mason*, 542 F.3d 545, 550 (7th Cir. 2008). The court does not make credibility determinations or weigh conflicting evidence. *McCann* v. *Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

ANALYSIS

I.    <u>Illegal Seizure of Susan (Count I)</u>

In Count I, Susan brings a § 1983 claim against Vela-Sailsbery, alleging that she seized Susan when she initiated involuntary commitment proceedings against her in retaliation for the Dobrzenieckis' past run-ins with the Sauk Village Police Department. (Am. Compl. ¶ 55-60.) Like an arrest, a civil commitment is a seizure implicating the Fourth Amendment, and may only be made upon probable cause. *Rusinowski* v. *Village of Hillside*, No. 11 C 4772, 2011 WL 6842509, at *3 (N.D. Ill. Dec. 29, 2011) (Leinenweber, J.) (citing *Villanova* v. *Abrams*, 972 F.2d 792, 795 (7th Cir. 1992)). For an involuntary commitment, probable cause exists "only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Fitzgerald* v. *Santoro*, 707 F.3d 725, 732 (7th Cir. 2013). In Illinois, that standard is met when an officer has "reasonable grounds to believe that the person is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization to protect such person or others from physical harm." *Rusinowski*, 2011 WL 6842509, at *3 (citing 405

- 10 -

ILCS 5/3-606). Because probable cause "turns on the assessment of probabilities in particular factual contexts . . . it is usually a jury question." *Ford* v. *Childers*, 855 F.2d 1271, 1276 (7th Cir. 1988) (citations omitted). If the material facts are not disputed, however, a court may find probably cause as a matter of law. *See Maxwell* v. *City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993).

Vela-Sailsbery argues that Susan's crying and statement that "she wanted to die," established reasonable grounds to believe that Susan would harm herself if she was not immediately hospitalized. (Dkt. No. 208 at 8.) The court does not agree.

As a threshold matter, there is an unresolved factual dispute regarding what Susan actually said. Vela-Sailsbery stated that Susan said "I just want to die, I do, I just want to die." Susan, by contrast, claims that she said "If [Peter] dies, I want to die." As this court noted in denying Vela-Sailsbery's motion to dismiss, "such a statement, made by Susan in the immediate aftermath of learning [of her son's shooting], is very different from repeatedly saying that she *wanted* to die." *Dobrzeniecki* v. *Salisbery*, No. 11 C 7956, 2012 WL 1531278, at *6 (N.D. Ill. Apr. 27, 2012) (emphasis original).

The gap between the time Susan made the disputed statement about desiring to die and the time Vela-Sailsbery reported it similarly does not support a finding of probable cause. Probable cause required that Susan be in need of *immediate* hospitalization to prevent her from harming herself. *Rusinowski*, 2011 WL 6842509, at *3. But Vela-Sailsbery did not act on Susan's purportedly suicidal statement immediately. Instead, after informing Susan of her son's shooting, Vela-Sailsbery first went inside the Sauk Village administrative building and then went to lunch with her assistant. She only drove to St. James after receiving a call on her cell phone from Hill-Corley. At the summary judgment phase, the court must view the evidence in the light

most favorable to the opposing party. *See, e.g., Tolan* v. *Cotton*, 134 S. Ct. 1861, 1866 (2014) (citations omitted). Vela-Sailsbery's actions after hearing Susan's statement, viewed in the light most favorable to Susan, support a finding that Vela-Sailsbery did not truly believe Susan was an immediate threat to herself.

Vela-Sailsbery alternatively argues that she is entitled to qualified immunity on Susan's unlawful seizure claim. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982)). Officers are not, however, protected by qualified immunity when they are "plainly incompetent or . . . knowingly violate the law." *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986). Vela-Sailsbery argues that the "dire gravity of the scene would lead anyone of reasonable prudence to seek attention for their colleague." (Dkt. No. 208 at 8.) She further argues that she reasonably believed that she had probable cause to prepare the Petition and, to the extent she did not, her erroneous belief was a good-faith mistake. (*Id.* at 12.)

Although qualified immunity is an entitlement not to stand trial, the general rule of summary judgment still applies: "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866. Here, Vela-Sailsbery's statements on the Petition undermine any claims of good-faith mistake. Vela-Sailsbery erroneously described Susan as mentally retarded, erroneously described herself—rather than Susan's best friend who was also at St. James—as the "spouse, parent, guardian, substitute decision-maker, close relative, or friend," erroneously described Susan's statement in the parking lot of the administrative building, and omitted the fact that Susan had made the statement earlier in the day and

immediately after hearing that Peter had been shot in the face. The veracity of the foregoing misstatements is, of course, disputed. But viewed in the light most favorable to Susan, Vela-Sailsbery's statements support a deliberate violation of the law, not a good-faith mistake that would entitle Vela-Sailsbery to qualified immunity.

Accordingly, because the existence of probable cause to support Susan's involuntary commitment depends on several disputed material facts, the court cannot grant summary judgment in Vela-Sailsbery's favor on Count I of the Fourth Amended Complaint.

II.     Seizure of Susan's Purse and Keys

In Count II, Susan seeks to recover against Vela-Sailsbery for the separate seizure of her purse and keys. Vela-Sailsbery puts forth a number of contradictory arguments which, on their own, illustrate why summary judgment is not appropriate. Vela-Sailsbery argues: (i) Susan's purse was seized by the St. James staff, not Vela-Sailsbery (Dkt. No. 208 at 10); (ii) Susan voluntarily gave her purse to Vela-Sailsbery (*id.*); (iii) Vela-Sailsbery lawfully seized Susan's purse pursuant to an inventory search incident to arrest (*id.* at 11); and (iv) there was no separate seizure of Susan's purse because her person had already been seized through her involuntary commitment (*id.*). Whether Vela-Sailsbery or St. James's staff seized Susan's purse is unquestionably a material fact, and is a fact that Vela-Sailsbery's summary judgment filings cannot themselves agree on. (*See, e.g.*, Dkt. No. 244 ¶ 18 ("Undisputed that Sailsbery was given the purse by Plaintiff. Plaintiff's purse was taken by hospital staff.")) Consequently, because the parties seem to dispute who seized Susan's purse, the question will have to be resolved by the trial jury. Vela-Sailsbery's motion for summary judgment on Count II is denied.

III.     Illegal Search of Dobrzeniecki Family Home

In Count III, Susan alleges that the Sauk Village Defendants violated the Dobrzenieckis'
Fourth Amendment rights when the officers entered the Dobrzenieckis' home using the keys
from Susan's purse and searched the home without a warrant. The Sauk Village Defendants
claim they went to the Dobrzenieckis' home to conduct a "wellness check" on Thomas. They do
not offer a reason for wanting to search the Dobrzenieckis' home, but nevertheless concede they
were looking for a firearm.[6]

The Sauk Village Defendants argue that they are entitled to summary judgment on the
warrantless entry and search claim because Thomas let them into the house and consented to the
search. (Dkt. No. 208 at 13-14.) "A warrantless search does not violate the Fourth Amendment if
a person possessing, or reasonably believed to possess, authority over the premises voluntarily
consents to the search." *United States* v. *King*, 627 F.3d 641, 647-48 (7th Cir. 2010) (quoting
*United States* v. *Groves*, 530 F.3d 506, 509 (7th Cir. 2008)). The existence of voluntary consent,
however, "is a question of fact to be determined based on the totality of the circumstances." *Id.*
(citing *United States* v. *Figueroa-España*, 511 F.3d 696, 704 (7th Cir. 2007)).

Here, whether Thomas actually consented to the search is hotly disputed. The Sauk
Village Defendants rely on Detective Grossman's statements that Thomas walked downstairs
and let the officers in, as well as Thomas's deposition testimony acknowledging that he
consented to the entry and search. Susan, by contrast, argues that Grossman's story is impossible
and further argues that Thomas's deposition testimony is inadmissible because he suffered from
dementia at the time of his deposition. The Sauk Village Defendants concede that the

---

[6]    The Sauk Village Defendants deny that Vela-Sailsbery suspected Susan of shooting her own
son.

admissibility of Thomas's testimony is "an evidentiary issue better suited for motions *in limine*," (Dkt. No. 242 at 8), and the court agrees. Notwithstanding Thomas's testimony, there are a number of other facts that weigh against the existence of consent. The most obvious is that Thomas was physically unable to walk down stairs in the manner described by Grossman. Although the Sauk Village Defendants dispute Thomas's mobility, Vela-Sailsbery herself stated that Thomas was "bed ridden" when she filled out the commitment Petition roughly an hour before the search. (Pet. at 3.) Tom Jr.'s testimony that Grossman had his mother's keys further undercuts Grossman's story that Thomas let the officers into the house. Finally, the Sauk Village Defendants' stated reason for being at the house—to conduct a "wellness check"—begs the question of why the officers would have discussed a search with Thomas in the first place.[7]

In sum, Susan has presented sufficient evidence from which a jury could reasonably infer that Thomas did not consent to the officers' entry and search of the Dobrzenieckis' home. Because the Sauk Village Defendants have offered no other justification for their warrantless entry and search, their motion for summary judgment on Count III must be denied.

IV.    Medical Malpractice Claim against the Hospital Defendants (Count VI)

In Count VI, Susan alleges that Dr. Brown and St. James failed to use the requisite standard of care and committed medical malpractice by holding Susan at St. James and transferring her to Riveredge against her will. Dr. Brown and St. James both argue they are entitled to summary judgment on Count VI because Susan has failed to present expert testimony establishing the elements of a medical malpractice claim. (Dkt. No. 228 11-12; Dkt. No. 229 at

---

[7]    The Sauk Village Defendants insinuate, but do not expressly argue, that there may have been no search because they only looked at items that were in plain view. (Dkt. No. 249 ¶ 50.) This fact is also disputed by Tom Jr.'s testimony that when he arrived home, the house was tossed and multiple drawers were left open, presumably as a result of the search.

4-7.) Under Illinois law, a plaintiff bringing a claim of medical negligence must show: "(1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately cause by the deviation from the standard of care." *Neade* v. *Portes*, 739 N.E.2d 496, 502 (Ill. 2000). And, in most cases, each element must be proven by expert testimony. *Purtill* v. *Hess*, 489 N.E.2d 867, 872 (Ill. 1986).

Dr. Brown and St. James argue that neither of Susan's disclosed experts, Nurse Przislicki and Dr. Ward, testified that Dr. Brown's and St. James's conduct was a proximate cause of Susan's "injury." Susan concedes that she has not presented expert testimony concerning proximate cause, but contends that such testimony is unnecessary because the element is within the common knowledge of the jury. In *Heastie* v. *Roberts*, 877 N.E.2d 1064 (Ill. 2007), the Illinois Supreme Court explained the limited circumstances where expert testimony is not necessary:

> Whether expert medical testimony is necessary in a given case depends on whether ascertaining the applicable standard of care, determining whether there was a deviation from that standard, and evaluating whether there was an injury proximately caused by that deviation require consideration of knowledge, skill, or training in a technical area outside the comprehension of a layperson . . . Expert testimony is not required if the health-care provider's conduct is so grossly negligent or the treatment so common that a layman could readily appraise it . . . or where the act alleged to be negligent is not an implicit part of the medical procedure.

*Heastie*, 877 N.E.2d at 1088.

Here, Susan's allegations concern Dr. Brown's exclusive reliance on the statements contained in Vela-Sailsbery's Petition. Specifically, Susan contends that Dr. Brown did nothing to verify that Susan had actually made purportedly suicidal statements and that Dr. Brown did nothing to verify that Susan was actually "non-compliant" with her medication. Despite Dr.

Brown's failure to verify these facts, Dr. Brown—at least according to the Certificate—based her decision to commit Susan exclusively on those facts. Factual verification is not an "implicit part of the medical procedure," and no special medical knowledge is necessary to realize that grounding an commitment order solely on the unconfirmed statements of a layperson might lead to a wrongful commitment. Accordingly, Susan's failure to provide expert testimony establishing proximate cause is not a basis to grant summary judgment in favor of the Hospital Defendants.

Dr. Brown further argues that the examination supporting her decision to commit Susan did not deviate from the requisite standard of care.[8] This position is contradicted by the expert testimony of Dr. Ward, who testified that Dr. Brown's exclusive reliance on Vela-Sailsbery's written statements and Dr. Brown's failure to gather information concerning Susan's prescribed medications deviated from the accepted standard of care required for such an examination. Based on Dr. Ward's testimony, a reasonable jury could find that Dr. Brown's examination deviated from the requisite standard of care. The disputed facts regarding Dr. Brown's examination will have to be presented and resolved by the trial jury.

Finally, St. James argues that it is entitled to summary judgment on any claims premised on Dr. Brown's conduct because Dr. Brown was not an agent of St. James. According to St. James, Dr. Brown was employed by Emergency Medicine Physicians of Cook County, LLC ("EMP") and worked at St. James pursuant to a contract between St. James and EMP. St. James further argues that it is not liable under an apparent agency theory. In Illinois, to succeed on an apparent agency claim, a plaintiff must prove that:

---

[8]    St. James's argued only that Susan failed to present expert testimony supporting proximate cause, not that Dr. Brown's conduct was consistent with the standard of care.

(1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.

*Gilbert* v. *Sycamore Municipal Hosp.*, 622 N.E.2d 788, 795 (Ill. 1993) (citations omitted).

St. James does not dispute that Susan has established the first two elements of apparent agency, but contends that Susan could not have relied on the apparent agency between St. James and Dr. Brown because she was placed in seclusion involuntarily. St. James's argument is unpersuasive. As a threshold matter, St. James's interpretation of the law would preclude liability any time St. James held someone against her will, merely because the detainment was "involuntary." Furthermore, after St. James's staff placed Susan in the seclusion room, she relied on the apparent agency between St. James and Dr. Brown when she agreed to Dr. Brown's battery of "invasive" tests. Susan had never met Dr. Brown before the day in question. The natural assumption at the time was that St. James, after placing Susan in seclusion, had sent one of its doctors to examine her. *See O'Banner* v. *McDonald's Corp.*, 670 N.E.2d 632, 634 (Ill. 1996) ("[I]f a principal creates the appearance that someone is his agent, he should not then be permitted to deny the agency if an innocent third party reasonably relies on the apparent agency and is harmed as a result.")

In *Gilbert*, the Illinois Supreme Court stressed that "[i]f a patient knows, or should have known, that the treating physician is an independent contractor, then the hospital will not be liable." *Gilbert*, 622 N.E.2d at 794; *see also Rusinowski* v. *Vill. of Hillside*, No. 11 C 4772, 2014 WL 477439, at *7 (N.D. Ill. Feb. 6, 2014) (rejecting apparent agency theory where patient signed waiver acknowledging doctor's independent contractor status). That is not the case here. St.

James presented Susan with no reason to believe that Dr. Brown was an independent contractor and therefore cannot deny liability on that basis.

V.    Negligent Infliction of Emotional Distress (Count VIII)

In Count VIII, Susan claims common law negligent infliction of emotional distress ("NIED") against Dr. Brown and St. James, alleging that Dr. Brown and St. James had a duty to provide medical services consistent with the requisite standard of care, breached that duty, and the breach proximately caused Susan to be injured.[9] Dr. Brown and St. James argue that Count VIII is duplicative because it is identical to Susan's medical malpractice claim, which also alleges that Dr. Brown's and St. James's deviation from the requisite standard of care resulted in her involuntary commitment. Susan largely agrees, but contends that her NIED claim is distinct from her medical malpractice claim because "damages between such claims are measured differently." (Dkt. No. 184 at 15.)

The court agrees that Susan alleges a different type of injury in Count VIII than in Count VI, but the distinction forecloses her claim in Count VIII. In Count VI, Susan's alleged injury was limited to the loss of her freedom. As discussed above, the court concluded that Susan need not present expert testimony proving proximate cause because no specialized medical knowledge was necessary to realize that Dr. Brown's blind reliance on third-party statements would lead to a wrongful commitment. In Count VIII, by contrast, Susan claims that her wrongful commitment resulted in "long-lasting traumatic neurosis which was severe and extreme." (Am. Compl. ¶ 86.) The description alone implies that determining the cause of "long-lasting traumatic neurosis"

---

[9]    Count VIII also contains allegations against Vela-Sailsbery. The court assumes Vela-Sailsbery's inclusion was inadvertent since the court in an earlier ruling dismissed Susan's NIED claim against Vela-Sailsbery as untimely. (*See* Dkt. No. 60 at 14-16.)

requires technical knowledge beyond the comprehension of a layperson. Susan acknowledges that her life at the time was replete with other sources of stress. Consequently, under Illinois law, Susan must present expert testimony proving that Dr. Brown's flawed examination—not those other stressors—caused her "long lasting traumatic neurosis." *Purtill*, 489 N.E.2d at 872. Susan's failure to do so entitles Dr. Brown and St. James to summary judgment on Count VIII.

VI.    Intentional Infliction of Emotional Distress (Count VII)

In Count VII, Susan claims that Dr. Brown and St. James intentionally inflicted emotional distress ("IIED") on her through their conduct. In her response to Dr. Brown's motion for summary judgment, Susan voluntarily conceded her IIED claim against Dr. Brown should be dismissed. (Dkt. No. 187 at 14.) Susan has not sought to dismiss her IIED claim against St. James, which rests primarily on the treatment Susan received while in seclusion at St. James, which she contends was "truly extreme and outrageous." (Dkt. No. 184.) Specifically, Susan objects to the lack of monitoring she received in seclusion, claims her rights were not posted inside the seclusion room, asserts that St. James personnel did not take her vital signs with sufficient frequency, and complains that no doctor re-examined Susan before St. James transferred her to Riveredge. (Dkt. No. 184 at 8.)

Under Illinois law, a plaintiff seeking to recover damages for an IIED claim must establish that: "(1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress." *Naeem* v. *McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006) (citations omitted). The standard for an IIED claim is high, and "under no circumstances [do] mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities qualify as

outrageous conduct." *Feltmeier* v. *Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (internal citations and quotations omitted). "Rather, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Id.* at 80-81.

Faced with this high standard, Susan does not cite any cases holding that actions similar to St. James's qualify as "extreme and outrageous." Susan dedicates a large portion of her Rule 56 Statement of Facts to establishing that St. James's treatment of her in seclusion fell short of the standards of the "Joint Commission" accrediting body. (*See, e.g.*, Dkt. No. 182 ¶¶ 5-11.) Although St. James's failure to adhere to all of the Joint Commission standards is disappointing, it is not sufficient to support an IIED claim. The court finds no reason to doubt that St. James's acts caused Susan further aggravation during an already stressful ordeal. But the acts at issue—posting patient rights, taking vital signs more frequently, and failing to examine Susan right before her transfer to Riveredge—are closer to "petty oppressions" than the "truly outrageous and extreme" conduct required to sustain an IIED claim. Consequently, St. James's motion for summary judgment on Count VII must be granted.

## CONCLUSION

For the reasons explained in this memorandum opinion, the court rules as follows: The Sauk Village Defendants motion for summary judgment [207] on Counts I, II, and III is denied in its entirety. Dr. Brown's motion for summary judgment [171] is denied with respect to Count VI, and granted as to Counts VII and VIII. St. James's motion for summary judgment [168] is denied with respect to Count VI, and granted as to Counts VII and VIII. The parties are strongly encouraged to discuss settlement regarding the remaining claims which, if not settled by agreement, will proceed to trial. This case is set for a report on status at 9:00 a.m. on 10/30/14.

ENTER:

_____

JAMES F. HOLDERMAN
District Judge, United States District Court

Date: October 6, 2014